UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Vincent Potter,

               Plaintiff,

      –v–

United States of America,

              Defendant.

17-cv-4141 (AJN)

OPINION & ORDER

ALISON J. NATHAN, District Judge:

On June 2, 2017, Plaintiff Vincent Potter commenced this medical malpractice action against the United States of America pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671, et seq., and 28 U.S.C. § 1346(b).[1] Now before the Court is the Government's motion for summary judgment. For the reasons that follow, that motion is GRANTED.

## I. BACKGROUND

### A. Factual Background

The parties contest many of the facts that give rise to this litigation. In this section, the Court lays out the undisputed facts.

Plaintiff began seeking treatment for insomnia at Callen-Lorde Community Health Center, a federally supported health center, on March 4, 2011. Dkt. No. 94 ¶ 1. His medical records from around that time indicate that he had been taking Trazodone, an antidepressant, to treat his insomnia for roughly the 14 prior years, though the parties dispute how regularly he took it during this period. *Id.* ¶ 2. During those 14 years, Plaintiff did not experience any so-

---

[1] As noted below, Plaintiff also initially sued the Department of Health and Human Services and Callen-Lorde Community Health Center, but these Defendants were later dismissed from the action.

called complex sleep related behaviors, such as throwing himself out of his bed, acting out a dream while asleep, or otherwise injuring himself in his sleep. *Id.* ¶ 3. Plaintiff testified that he did experience nightmares and would wake up screaming during this time, though his medical records reflect otherwise. *Id.* ¶¶ 3–5.

In October 2011, Plaintiff experienced a complex sleep related behavior during which he threw himself out of his bed and hit his head on the wall, requiring stitches. *Id.* ¶ 3. Plaintiff reported this incident to a practitioner at Callen-Lorde, and, at some point after doing so, he ceased taking Trazodone—which he had been prescribed by a previous provider—because he believed it had caused the October 2011 incident. *Id.* ¶ 18; Dkt. No. 78 at 5. Plaintiff later resumed taking Trazodone, and his practitioner at Callen-Lorde ultimately wrote him a new prescription for it. Dkt. No. 94 ¶ 18. The parties dispute whether Plaintiff began taking Trazodone again at the advice of the Callen-Lorde practitioner who represcribed it or of his own volition. *Id.* ¶ 19; Dkt. No. 78 at 7.

In February 2012, Plaintiff experienced another complex sleep related behavior. On September 8, 2015, Plaintiff experienced a third complex sleep related behavior, which involved getting up from his bed while asleep and colliding with his bedroom wall. Dkt. No. 94 ¶ 6. The parties dispute whether Plaintiff threw himself or fell into the wall, but they agree that this incident resulted in the spinal injury that gave rise to this litigation. *Id.*

During the course of this litigation, Plaintiff presented to the Zirinsky Center for Bipolar Disorder at the suggestion of his psychiatry expert, Dr. Ross DeLeonardo, and received a diagnosis of Bipolar II Disorder from Dr. Konstantin Nikiforov. *Id.* ¶ 10.

## B.     Procedural Background

Plaintiff initiated this action on June 2, 2017. *See* Dkt. No. 1. In his Second Amended Complaint, he asserts medical malpractice, lack of informed consent, and lack of supervision claims against the United States, the Department of Health and Human Services, and Callen-Lorde pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671, et seq., and 28 U.S.C. § 1346(b). Dkt. No. 19. Because the Federal Tort Claims Act provides that the exclusive remedy with respect to Plaintiff's claims is a suit against the United States, all Defendants but the Government were dismissed from the action on January 22, 2018. Dkt. No. ¶ 35.

Plaintiff's Second Amended Complaint claims, in relevant part, that Callen-Lorde deviated from standards of care in the community and that those deviations caused his spinal injury. Dkt. No. 19 ¶¶ 23–34. Dr. DeLeonardo, Plaintiff's standard of care expert, identifies four ways in which, in his opinion, Callen-Lorde deviated from standards of care in the community: by (1) failing to diagnose Plaintiff's Bipolar II Disorder and treat him for it; (2) prescribing Trazodone without first evaluating Plaintiff to determine whether he suffered from Bipolar II Disorder; (3) prescribing Trazodone to Plaintiff after he suffered a serious adverse side effect while taking it; and (4) failing to refer Plaintiff to a more specialized or qualified medical provider. *See generally* Dkt. No. 81-12. Plaintiff offers expert testimony from both Dr. DeLeonardo, a psychiatrist, and Dr. David Rosenbaum, a neurologist, that these deviations from standards of care caused Plaintiff's spinal injury. *See generally id.*; Dkt. No. 81-7.

The Government filed the summary judgment motion now before the Court on July 31, 2019. Dkt. No. 77. In its motion, the Government challenges the admissibility of Dr. DeLeonardo's and Dr. Rosenbaum's causation opinions. *See* Dkt. No. 78. Plaintiff filed his opposition to the Government's motion on September 9, 2019, Dkt. No. 87, and, in an

accompanying declaration, withdrew his informed consent and supervision claims, Dkt. No. 93 ¶ 27. The Government filed its reply on September 24, 2019, addressing only Plaintiff's medical malpractice claim in light of his withdrawal of his other claims. Dkt. No. 97. Thus, the Court now considers the Government's motion with respect to Plaintiff's medical malpractice claim only.

## II.   LEGAL STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether summary judgment is warranted, the court must "construe the facts in the light most favorable to the non-moving party and resolve all ambiguities and draw all reasonable inferences against the movant." *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 167 (2d Cir. 2014) (internal quotation marks and alterations omitted). There is a genuine issue of material fact if a reasonable jury could decide in the non-moving party's favor. *Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 45 (2d Cir. 2000). If the Court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial" and summary judgment should be granted to the moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted).

It is generally "the movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citation omitted). However, when the burden of proof at trial would fall on the non-moving party, the moving party may meet its burden by "point[ing] to a lack of evidence . . . on an essential element" of the non-moving party's claim. *Simsbury-Avon Preservation Club, Inc. v. Metacon Gun Club, Inc.*, 575

F.3d 199, 204 (2d Cir. 2009). To survive a summary judgment motion, the non-moving party must then "come forward with admissible evidence sufficient to raise a genuine issue of fact for trial." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013). In doing so, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . and may not rely on conclusory allegations or unsubstantiated speculation." *Id.* (internal quotation marks and citation omitted).

### III. DISCUSSION

The Government claims that it is entitled to summary judgment because Plaintiff's expert opinions on causation are inadmissible under the reliability requirements of Federal Rule of Evidence 702. Without any admissible expert evidence on causation, the Government argues, Plaintiff has failed to establish an essential element of his claim.

"[T]he FTCA defines the liability of the United States in terms of that of a private individual under the law of the state where the alleged tort occurred . . . ." *Guttridge v. United States*, 927 F.2d 730, 732 (2d Cir. 1991); *see also* 28 U.S.C. § 2674. Accordingly, because the alleged tort occurred in New York, New York law applies to this action. To prove medical malpractice under New York law, a plaintiff must establish "(1) that the defendant breached the standard of care in the community, and (2) that the breach proximately caused the plaintiff's injuries." *Arkin v. Gittleson*, 32 F.3d 658, 664 (2d Cir. 1994). Moreover, "it is well established in New York law that unless the alleged act of malpractice falls within the competence of a lay jury to evaluate, it is incumbent upon the plaintiff to present expert testimony in support of the allegations to establish a prima facie case of malpractice." *Sitts v. United States*, 811 F.3d 736, 739 (2d Cir. 1987) (internal quotation marks and citation omitted). Thus, expert testimony is generally necessary to "establish the applicable standard of practice and, in an appropriate case,

to determine whether an alleged deviation from that standard was the proximate cause of a plaintiff's injuries." *Alford v. United States*, 2020 WL 376749, at *14 (S.D.N.Y. Jan. 23, 2020) (quoting *Berk v. St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 343 (S.D.N.Y. 2005)). "Plaintiffs are only excused from providing expert testimony in medical malpractice cases where 'a deviation from a proper standard of care [is] so clear and obvious that it will be within the understanding of the ordinary layman without the need for expert testimony.'" *Zeak v. United States*, 2014 WL 5324319, at *8 (S.D.N.Y. Oct. 20, 2014) (quoting *Sitts*, 811 F.3d at 740).

"Because the purpose of summary judgment is to weed out cases in which there is no genuine issues as to any material fact and the moving party is entitled to a judgment as a matter of law, it is appropriate for district courts to decide questions regarding the admissibility of evidence on summary judgment," including the admissibility of expert evidence. *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) (internal quotation marks, citation, and alterations omitted). The party seeking to introduce expert testimony "bears the burden of establishing its admissibility by a preponderance of the evidence." *Baker v. Urban Outfitters, Inc.,* 254 F. Supp. 2d 346, 353 (S.D.N.Y. 2003). Federal Rule of Evidence 702 allows expert testimony if: (a) the expert's . . . specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. In evaluating expert testimony under this standard, the court acts as a gatekeeper to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 597 (1993).

The reliability inquiry envisioned by *Daubert* is "a flexible one," *id.* at 594, and the factors to be considered "depend[] upon the particular circumstances of the particular case at issue," *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 150 (1999).  The Second Circuit has emphasized that courts should focus on "the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony 'is the product of reliable principles and methods'; and (3) that 'the witness has applied the principles and methods reliably to the facts of the case.'"  *Amorgianos v. Nat'l R.R. Passenger Corp.,* 303 F.3d 256, 265 (2d Cir. 2002) (quoting Fed. R. Evid. 702).  This "flexible *Daubert* inquiry gives the . . . court the discretion needed to ensure that the courtroom door remains closed to junk science while admitting reliable expert testimony."  *Id.* at 267.

If a court excludes expert evidence as inadmissible under Rule 702 of the Federal Rules of Evidence, it must then "make the summary judgment determination on a record that does not include that evidence."  *Gjini v. United States*, 2019 WL 498350, at *13 (S.D.N.Y. Feb. 8, 2019) (quoting *Colon ex rel. Molina v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 68 (S.D.N.Y. 2001)).  Furthermore, if, after resolving issues of admissibility, "the admissible evidence is insufficient to permit a rational juror to find in favor of the plaintiff, the court remains free to . . . grant summary judgment for defendant."  *Amorgianos*, 303 F.3d at 267.  In other words, summary judgment may be granted in a defendant's favor in a medical malpractice action—even in the face of genuine disputes of fact—if the plaintiff "fail[s] to identify any medical expert who could establish his prima facie case at trial."  *Sitts*, 811 F.2d at 742.  This is so because "where there is no genuine issue as to the existence of a fact that *dispositively entitles the moving party to judgment as a matter of law*, all other facts become immaterial."  *Id.* (emphasis added); *see also Zeak*, 2014 WL 5324319, at *11 ("If a plaintiff cannot establish a prima facie case without the

benefit of expert testimony, and the plaintiff is unable to procure such testimony, then summary judgment is appropriate.").

### A. Plaintiff has Failed to Offer Admissible Expert Testimony on Causation

To satisfy his burden at trial, Plaintiff would have to demonstrate, by admissible expert testimony, that the standard of care in the community was breached and that that breach proximately caused his injuries. *See Arkin*, 32 F.3d at 664. Indeed, this is not the "rare" medical malpractice action in which expert testimony is unnecessary to establish the elements of Plaintiff's claim, and Plaintiff does not argue that it is. *See Sitts*, 811 F.2d at 739–40 (providing examples of cases in which expert testimony is not required, including "where a dentist has pulled the wrong tooth, or where an unexplained injury has occurred to a part of the body remote from the site of the surgery"). The Government argues that Plaintiff cannot satisfy his burden because he has offered no admissible expert testimony on causation. The Court agrees.

Generally, district courts must first "consider whether the witness is qualified by knowledge, skill, experience, training, or education to render his or her opinions as an expert, before reaching an analysis of the testimony itself." *Vale v. United States of Am.*, 673 F. App'x 114, 116 (2d Cir. 2016) (summary order) (citing *Nimely v. City of N.Y.*, 414 F.3d 381, 396 n.11 (2d Cir. 2005)). The Court assumes for purposes of its Rule 702 analysis that Plaintiff's experts are qualified and proceeds to consider whether either expert has offered an admissible opinion on causation.

To establish causation in a medical malpractice action, a "plaintiff must demonstrate that the defendant's deviation from the standard of care was a *substantial factor* in bringing about the injury."[2] *Majid v. Cheon-Lee*, 147 A.D.3d 66, 69 (3d Dep't 2016) (emphasis added) (quoting

---

[2] The Government also argues that, in order to show that a medication caused an injury, Plaintiff must establish both general causation (*i.e.* whether exposure to the medication can cause the *type* of injury alleged) and

*Clune v. Moore*, 142 A.D.3d 1330, 1331 (4th Dep't 2016)). Where, as here, expert testimony is required, the expert's opinion must "demonstrate the requisite nexus between the malpractice allegedly committed and the harm suffered." *Crowhurst v. Szczucki*, 2019 WL 565811, at *4 (S.D.N.Y. Feb. 11, 2019) (quoting *Anyie B. v. Bronx Lebanon Hosp.*, 128 A.D.3d 1, 3 (1st Dep't 2015)); *see also Ongley v. St. Lukes Roosevelt Hosp. Ctr.*, 725 F. App'x 44, 47 (2d Cir. 2018) (summary order).

Even assuming Plaintiff's experts are qualified to testify, the Court concludes that their opinions on causation fail to satisfy *Daubert's* reliability test.

### 1. Dr. DeLeonardo

Dr. DeLeonardo posits four primary causes of Plaintiff's injuries: (1) failing to diagnose Plaintiff with Bipolar II Disorder and to properly treat him for that condition, *see* Dkt. No. 81-12 ¶ 28; (2) prescribing Plaintiff Trazodone without first thoroughly evaluating him for Bipolar II Disorder, *see id.* ¶ 41; (3) prescribing Plaintiff Trazodone after he suffered a serious adverse side effect—the October 2011 complex sleep related behavior—while taking it, *id.* ¶ 48; and (4) failing to refer Mr. Potter to a more specialized or qualified medical provider, *id.* ¶ 60. In deciding whether Dr. DeLeonardo's testimony is reliable, the Court "undertake[s] a rigorous examination of the facts on which the expert relies, the method by which the expert draws an

---

specific causation (*i.e.* whether plaintiff's exposure actually caused *his* injury). *See* Dkt. No. 78 at 18. While Plaintiff does not dispute that he must prove both general and specific causation, a review of New York medical malpractice case law reveals few cases in which such proof was required, and the Court is aware of few cases in this Circuit in which a court has required a plaintiff to separately establish general and specific causation in a medical malpractice action brought under New York law. *See, e.g., McElroy v. Albany Mem'l Hosp.*, 332 F. Supp. 2d 502, 506 (N.D.N.Y. 2004). Indeed, the in-circuit cases the Government cites in support of its argument are products liability—not medical malpractice—cases. *See, e.g.*, *Adeghe v. Janssen Pharm., Inc.*, 2017 WL 3741310, at *3 (S.D.N.Y. Aug. 30, 2017).

The Court ultimately finds it unnecessary to decide whether Plaintiff must prove general and specific causation separately because these inquiries merge in practice in this case. And, regardless of whether the Court were to require Plaintiff to separately establish general and specific causation, it would reach the same conclusion with respect to the reliability of his experts' testimony on causation.

9

opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos*, 303 F.3d at 267.

With respect to his first opinion, Dr. DeLeonardo explains that "[t]he sleep disturbance [Plaintiff] experienced was a symptom of untreated Bipolar II Disorder," and thus "[h]ad [Plaintiff] received proper treatment of Bipolar II Disorder, he likely would not have been experiencing the type of sleep disturbance that caused him injury in September, 2015." Dkt. No. 81-12 ¶ 39.

This opinion is unreliable and thus inadmissible because Dr. DeLeonardo's deposition testimony lays bare the fact that it is neither "based on sufficient facts or data" nor the product of reliable methods. *See* Fed. R. Evid. 702. In Dr. DeLeonardo's deposition testimony, he did *not* testify that the complex sleep related behavior that caused the September 2015 incident is, in fact, a symptom of Bipolar II. Indeed, in his testimony, Dr. DeLeonardo clarified that the "sleep disturbance" that is a symptom of Bipolar II Disorder is a decreased need for sleep. *See, e.g.*, Dkt. No. 81-11 at 75:3–19 (explaining that when he used "sleep disturbance" in this context he meant "not getting many hours of sleep at night and feeling energized"); *see also* Dkt. No. 81-12 ¶¶ 31–32 (describing decreased need for sleep as a symptom of Bipolar II Disorder in the fifth, and current, edition of the Diagnostic and Statistical Manual of Mental Disorders). He further testified that he is not aware of any other type of sleep disturbance that is a "hallmark of bipolar disorder," and answered "no" when explicitly asked whether complex sleep related behavior is a symptom of Bipolar II Disorder. *See, e.g.*, Dkt. No. 81-11 at 79:10–81:20.

In an attempt to nonetheless establish some link between Plaintiff's alleged undiagnosed and untreated Bipolar II and Plaintiff's complex sleep related behavior, Dr. DeLeonardo posits that *if* the Bipolar II-related sleep issues Plaintiff was experiencing—namely a decreased need

10

for sleep—were "addressed correctly to begin with, it may have arrested any kind of evolution into the further sleep issues that he experienced." Dkt. No. 81-14 at 48:19–49:9. However, he provides no support for this opinion other than the fact that when Plaintiff "started getting treated for Bipolar II Disorder," the complex sleep related behavior went away. Dkt. No. 49:5–49:21. Setting to one side the truth of this statement, which the parties dispute, "relying wholly on a temporal relationship is not sound scientific methodology that is admissible under Rule 702 and *Daubert*." *In re Fosamax Prod. Liab. Litig.*, 2009 WL 4042769, at *7 (S.D.N.Y. Nov. 23, 2009), *aff'd sub nom. Flemings v. Merck & Co.*, 399 F. App'x 672 (2d Cir. 2010) (collecting cases). Accordingly, the Court concludes that Dr. DeLeonardo's first causation opinion is inadmissible.

Dr. DeLeonardo's second opinion fares no better. The logic behind this opinion is that *if* Plaintiff had been properly screened for Bipolar II Disorder before he was prescribed Trazodone, his provider would have realized he had Bipolar II and not prescribed him *only* Trazodone, an antidepressant which on its own is contraindicated for those with Bipolar Disorder; and, if he had not been taking Trazodone alone, he would not have experienced the complex sleep related behavior that caused his injuries in September 2015. This is so, Dr. DeLeonardo posits, because Trazodone is "likely to worsen *symptoms* in bipolar patients when not given in conjunction with a mood stabilizer." Dkt. No. 81-12 ¶ 41 (emphasis added). However, as discussed above, Dr. DeLeonardo did not testify or otherwise opine that the complex sleep related behavior that caused Plaintiff's injuries is a *known symptom* of Bipolar II Disorder.

The only evidence Dr. DeLeonardo offers of Trazodone exacerbating any symptom of Bipolar II Disorder is the medication's FDA label, which indicates that prescribing "an antidepressant alone may increase the likelihood of a mixed-manic episode in patients" *See id.* ¶ 42. However, he does not offer the opinion that Plaintiff was experiencing a mixed or manic

11

episode on the night of his injury, *see* Dkt. No. 81-11 at 92:18–24, nor is he aware of any other symptoms of Bipolar II Trazodone is likely to worsen, let alone any symptoms that could have *caused* Plaintiff's injuries. *Id.* at 92:2–7. Indeed, Dr. DeLeonardo has no recollection of *ever* having treating a patient with Bipolar Disorder who exhibited a complex sleep related behavior while on any antidepressant, including Trazodone. Dkt. No. 81-11 at 85:15–86:3.

In the absence of other evidence to support his conclusion, he falls back again on the temporal association between Plaintiff taking Trazodone and exhibiting complex sleep related behavior. *See* Dkt. No. 81-14 at 57–59. However, as articulated above, temporal association alone is "not sound scientific methodology that is admissible under Rule 702 and *Daubert*." *In re Fosamax Prod. Liab. Litig.*, 2009 WL 4042769, at *7. A rigorous examination of the facts on which Dr. DeLeonardo relies thus reveals that his second opinion "is connected to existing data only by the *ipse dixit* of the expert." *Nimely*, 414 F.3d at 396. Because he completely lacks "good grounds" to support this opinion, *see* Amorgianos, 303 F.3d at 267, the Court concludes that there is simply "too great an analytical gap between the data and the opinion proffered" to admit it under the Federal Rules of Evidence, *see General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Dr. DeLeonardo's third opinion suggests that Trazodone alone—and *not* in conjunction with Plaintiff's allegedly undiagnosed and untreated Bipolar II Disorder—caused Plaintiff's injuries. He grounds this opinion, in part, in the drug's FDA label, which allegedly reports various "known side effects," including "sleep disturbance, nightmares, and vivid dreams."[3]

---

[3] In fact, the FDA label does *not* list sleep disturbance as a side effect of Trazodone, but rather indicates that sleep disturbance has been reported as a symptom of *withdrawal* when patients cease taking Trazodone. *See* Dkt. No. 92-12. It *does* list orthostatic hypotension—which can cause fainting—as a known side effect, *see id.*, and Dr. DeLeonardo suggests that Plaintiff's injuries may have resulted from an orthostatic-hypotension-induced fall. *See* Dkt. No. 81-12 ¶¶ 45–46. Because the Court concludes below that Dr. DeLeonardo has not offered admissible evidence that any alleged breach of the standards of care caused the complex sleep related behavior that would have preceded any such fall, it does not consider whether Trazodone could have caused the subsequent fall itself.

Dkt. No. 81-12 at ¶ 50.  However, he admits that complex sleep related behavior is *not* a known side effect of Trazodone, *see* Dkt. No. 81-8 at 194:19–24, and describes complex sleep related behavior—which "involve[s] getting up and walking around"—as "distinct" from and having different causes than nightmares—which are "more of a cognitive and anxiety associated sensation," *id.* at 159:23–160:10.

Dr. DeLeonardo ultimately concludes that "in all likelihood [Plaintiff] had an *unusual* reaction to the Trazodone causing this sleepwalking event," *id.* at 129:18–20, basing this opinion on the ever-present possibility that a patient might "experience side effects not previously demonstrated in clinical studies that are unique" to him, Dkt. No. 81-12 ¶ 50.  However, this opinion is once again borne only of the unsound methodology of temporal relation.  Indeed, Dr. DeLeonardo testified on several occasions that his "methodology for coming to [this] conclusion," is "[v]ery simply that [Plaintiff] took [Trazodone] [and] had the event happen . . . after taking the medication for a while."  Dkt. No. 81-8 at 136:19–24; *see also id.* at 137:23–24 ("[M]y methodology is knowing the medication is taken proximately to the events."); *id.* at 160:21–161:9 (explaining that Trazodone is the most likely candidate for causing Plaintiff's complex sleep related behavior "because the plaintiff was on that medication when he had these substantial events . . . [and] he was not having these events when off Trazodone").  The speculative and conjectural nature of this opinion is underscored by the fact that Dr. DeLeonardo testified that he believes that Trazodone interfered with Plaintiff's sleep but does not know "exactly how" and, indeed, does not even know whether "there is a possibility that [T]razodone can trigger a complex sleep related event." Dkt. No. 81-11 at 92:8–93:5.  Where, as here, "an expert opinion is based on data . . . [or] a methodology . . . that are simply inadequate to support

13

the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266.

The exclusion of Dr. DeLeonardo's fourth and final opinion follows from the exclusion of his third. Though he does not explicitly explain how failing to refer Plaintiff to a "more specialized or more qualified provider" caused Plaintiff's injuries, he implies that such a provider would have switched Plaintiff to a medication other than Trazodone. *See* Dkt. No. 81-12 ¶ 62 (noting that when Plaintiff was ultimately referred to a sleep specialist, that provider switched him off Trazodone and onto Klonopin). Inherent in this opinion is the assumption that Trazodone caused Plaintiff's complex sleep related behavior, a conclusion the Court has already found unsupported by any opinion offered by Dr. DeLeonardo above. Accordingly, the Court excludes DeLeonardo's fourth opinion as similarly flawed. To the extent Dr. DeLeonardo also opines that a *combination* of all of the causes discussed above was *the* proximate cause of Plaintiff's injuries, *see* Dkt. No. 81-14 at 39–40, this opinion is also inadmissible for the simple reason that each constituent part of it is inadmissible.

### 2. Dr. Rosenbaum

Dr. Rosenbaum offers one opinion in his expert report as to what caused Plaintiff's injuries: that Plaintiff experienced an episode of REM Sleep Behavior Disorder—a disorder that causes complex sleep related behavior—on September 8, 2015 that was caused by Trazodone. Dkt. No. 81-7 at 8–9. This opinion is inadmissible for many of the same reasons identified above.

First, this opinion is likewise the product of an unscientific methodology. Indeed, Dr. Rosenbaum admits that complex sleep related behavior is not a known side effect of Trazodone, *see* Dkt. No. 81-13 at 43:24–44:1; *id.* at 90:9–12, and testified that determining whether a

medication is the precipitating factor of a *particular* incident is a "purely historical" inquiry, *see id.* at 39:14–22 ("Q: How does one determine whether a particular violent sleep episode would or would not have happened but for the use of the medication? A: That would be purely historical. The medication associated with the episode and if the episode had not occurred without the medication, that's the evidence that the medication was the precipitating factor."); *see also id.* at 93:6–12 ("Q: Your opinion that the September 8, 2015, accident was caused by trazodone is based purely on the fact that Mr. Potter had previously experienced complex sleep-related behaviors while on trazodone? A: Yes."). Accordingly, he bases his opinion that Trazodone caused Plaintiff's injuries on the fact that "all of the episodes [he was aware of at the time of his deposition] in which [Plaintiff] exhibited [complex sleep related behavior] occurred when [Plaintiff] was on Trazodone." *Id.* at 85:24–86:9. As discussed above, however, "an expert's opinion should be grounded in more than the mere temporal proximity between a plaintiff's symptoms and the alleged cause of the symptoms." *DeRienzo v. Metro. Transp. Auth.*, 694 F. Supp. 2d 229, 237 (S.D.N.Y. 2010).

While Dr. Rosenbaum does offer other evidence beyond the mere temporal association between Plaintiff taking Trazodone and exhibiting complex sleep related behavior, this opinion evidence is not "based on sufficient facts or data" to pass muster under Rule 702. He asserts that this temporal association is corroborated by "ample literature implicating antidepressant medications in precipitating REM Sleep Behavior Disorder (RBD)," which Dr. Rosenbaum believes caused a complex sleep related behavior in September 2015 that resulted in Plaintiff's injuries. Dkt. No. 81-7 at 9. However, he does not cite any of this literature in his report and could not specifically identify this literature at his deposition. *See* Dkt. No. 81-13 at 89:18–90:5. Moreover, he concedes that this literature does not specifically discuss Trazodone, but rather

15

only discusses antidepressants generally. *Id.* at 90:6–8. While Plaintiff argues that Dr. Rosenbaum's opinion is based on his "clinical experience," Dkt. No. 87 at 32–33, "an expert relying solely on his experience 'must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" *Vale v. United States*, 2015 WL 5773902, at *12 (E.D.N.Y. Aug. 28, 2015), *report and recommendation adopted*, 2015 WL 5773729 (E.D.N.Y. Sept. 30, 2015), *aff'd sub nom. Vale v. United States of Am.*, 673 F. App'x 114 (2d Cir. 2016) (quoting Fed. R. Evid. 702 advisory committee's note (2000 Amendments)). In this case, Dr. Rosenbaum does not claim that he has ever treated a patient who experienced a complex sleep related behavior while on antidepressants. Indeed, he provides no rationale for why his experience as a neurologist leads him to the conclusion that antidepressants generally—and Trazodone specifically—*can* precipitate REM Sleep Behavior Disorder and *did* do so here.[4] Moreover, he undercut his own, unsupported opinion when asked if it is possible for a patient to begin experiencing complex sleep related behaviors in midlife *not* precipitated by their use of Trazodone; in response, he noted that "that's the most common situation." Dkt. No. 81-13 at 101:25–102:6. Where, as here, an expert's opinion provides no "explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion"—and relies only on the "*ipse dixit*" of the expert—it must be excluded under *Daubert* and Rule 702. *See Riegel v. Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006); *see also Bah v. Nordson Corp.*, 2005 WL 1813023, at *9 (S.D.N.Y. Aug. 1, 2005) ("[T]he trial court's

---

[4] Though he does provide an explanation for why Trazodone would be *more likely than other antidepressants* to "result in violent behavior during sleep," *see* Dkt. No. 81-7 at 9; Dkt. No. 81-13 at 91:9–92:11, as discussed above, he does not provide sufficient support for the antecedent proposition that antidepressants generally are implicated in precipitating REM Sleep Behavior Disorder.

16

gatekeeping function requires more than simply taking the expert's word for it." (quoting Fed. R. Evid. 702 advisory committee's note (2000 Amendments))).

\*     \*     \*     \*     \*

In sum, *Daubert* and Rule 702 mandate the exclusion of both Dr. DeLeonardo's and Dr. Rosenbaum's expert testimony on causation as unreliable because their opinions are based on data and methodologies "that are simply inadequate to support the conclusions reached." *Amorgianos*, 303 F.3d at 266. Because the Court concludes that this testimony is inadmissible for the reasons articulated above, it does not consider the other grounds the Government offers for its exclusion. The Court also notes that in so concluding, it does not rely on any of the medical literature cited for the first time in Plaintiff's opposition brief. *See generally* Dkt. No. 87. Not only is this literature offered by Plaintiff himself, rather than Plaintiff's experts, but it is offered by him in a transparent attempt to bolster his experts' opinions long after expert reports have been served and discovery closed. *See* Fed. R. Civ. P. 26 (requiring that an expert's report must include, among other things, "a complete statement of all opinions the witness will express and the basis and reasons for them"; "the facts or data considered by the witness in forming them"; and "any exhibits that will be used to summarize or support them").

### B.     The Government is Entitled to Summary Judgment

"If a plaintiff cannot establish a prima facie case without the benefit of expert testimony, and the plaintiff is unable to procure such testimony, then summary judgment is appropriate." *Zeak*, 2014 WL 5324319, at \*11 (quoting *Adorno v. Corr. Serus. Corp.*, 312 F. Supp. 2d 505, 514 (S.D.N.Y. 2004)). Because expert opinion evidence is required to establish the element of causation and Plaintiff has failed to offer any admissible expert evidence on causation, the

Government is entitled to summary judgment on Plaintiff's medical malpractice claim. *See id.*; *see also, e.g.*, *Crowhurst*, 2019 WL 565811, at *5; *Berk*, 380 F. Supp. 2d at 356.

## IV. CONCLUSION

For the foregoing reasons, the Government's motion for summary judgment is GRANTED. The Clerk of Court is respectfully requested to enter judgment and close this case.

This resolves Dkt. No. 77.

SO ORDERED.

Dated: May 30, 2020
       New York, New York

_____
ALISON J. NATHAN
United States District Judge